1  **HANNI M. FAKHOURY**
   California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   Telephone: (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Ms. Dagnino

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| UNITED STATES OF AMERICA, | ) CASE NO.: 11CR0229-WQH |
|---|---|
| Plaintiff, | ) |
| v. | ) STATEMENT OF FACTS AND |
|  | ) MEMORANDUM OF POINTS AND |
| YVETTE DAGNINO, ET AL., | ) AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. | ) |

**I.**

**STATEMENT OF FACTS**[1]

On January 5, 2011, Border Patrol agents were conducting "anti-smuggling operations" in plain clothes and unmarked patrol vehicles in Brawley, California, approximately 23 miles north of the international border and the Calexico Port of Entry. At approximately 5:30 a.m., agents observed a grey Saturn Ion driving on River Drive. The agents also observed a Nissan Sentra driving behind the Saturn. The agents believed the car was "riding low" and was "crowded." Yet, neither of the cars had more people in

---

[1]. The facts detailed in this motion are taken from the discovery provided to Ms. Dagnino by the government. Specifically, the facts are taken from the January 5, 2011 Report of Investigation ("ROI"), a portion of which is attached to this motion as Exhibit A. Ms. Dagnino does not stipulate to the accuracy of the facts or the report and reserves the right to challenge it at future proceedings. Moreover, Ms. Dagnino contends that if this Court were to believe all of the facts recited by the agents, her arrest would be invalid under the 4th Amendment. Therefore, she has not provided the Court with her own sworn declaration as is required by Local Criminal Rule 47.1(g). However, Ms. Dagnino can provide a declaration for the Court if ordered to do so.

them then the rated capacity. However, the Border Patrol agents decided not to initiate a traffic stop. Instead they called the Brawley Police Department and asked them to follow the cars.

Brawley police officers Brown and Linville then proceeded to follow the cars for a few miles before initiating a traffic stop on the Sentra. According to the ROI, "the police officers initiated a vehicle stop on the Sentra for failure to use a turn signal as the Sentra turned northbound on Highway 111 from River Drive." Exhibit A. The actual traffic stop occurred further north on Highway 111, past the Del Rio Country Club. As the maps attached as Exhibit B indicate, however, River Drive and Highway 111 do not intersect. It was thus *impossible* for the Sentra to fail to use a turn signal as it turned northbound on Highway 111 as the report contends.

Once the Sentra was stopped, agents conducted an interview and determined that the driver of the Sentra was Ms. Dagnino. Also in the car were four passengers, one in the front seat and three in the back. Thus, there was five total people in the Sentra, which is the rated passenger capacity of a Nissan Sentra. The agents determined that the four passengers in the car were here in the United States illegally, and took them into custody. After Ms. Dagnino had been arrested and taken into custody, the agents decided to pull the Ion over as well. There they determined that Ms. Beltran was driving the vehicle, and her four passengers were also in the United States illegally. Like the Sentra, the Ion also had a total of five people inside of it, consistent with the rated capacity of the Ion.

At the Border Patrol station, agents interrogated Ms. Beltran, who exonerated Ms. Dagnino completely from any criminal involvement. She told agents that Ms. Dagnino was not aware that the four people in the Sentra she was driving were here in the United States illegally, as she had not told her. The agents also interrogated all eight of the undocumented people arrested in the two cars. Of those eight, six were kept as material witnesses. Two were deported and not retained as material witnesses. Of the six that were retained as material witnesses, they explained that after crossing the border fence, they went to a trailer where they waited. They were then directed into two cars and apprehended. All had agreed to pay thousands of dollars to enter and be transported into the United States. Critically, of these six material witnesses, two were unable to identify Ms. Dagnino from a photo lineup. The four remaining material witnesses identified three different pictures as Ms. Dagnino. It is unknown whether the two deported illegal aliens identified Ms. Dagnino at all.

On January 19, 2011, a six count indictment was filed, charging Ms. Dagnino and Ms. Beltran with transporting illegal aliens, and aiding and abetting, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(ii).

## II.

## MOTION TO COMPEL DISCOVERY

Ms. Dagnino moves for production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989). Specifically, Ms. Dagnino moves for the production of the following evidence:

1. **<u>Ms. Dagnino's Statements.</u>** Ms. Dagnino requests the government disclose any and all written, recorded and oral statements made by her, as well any written summaries of her oral statements contained in the handwritten notes of any Government agent. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> of Ms. Dagnino's statements, whether written or oral, regardless of whether the Government intends to make any use of those statements. Ms. Dagnino specifically requests any audio and videotaped copies of her statements and any rough notes taken pertaining to the substance of her statements. **Furthermore, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(i), Ms. Dagnino requests copies of the audio tapes of any taped telephone calls made while she was in custody.**

2. **<u>Arrest Reports, Notes and Dispatch Tapes.</u>** Ms. Dagnino also requests that all arrest reports, notes, dispatch or any other tapes and TECS records that relate to the circumstances surrounding her arrest or any questioning, be turned over. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Ms. Dagnino or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Ms. Dagnino. <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 12(I) and 26.2. Ms. Dagnino includes in this request any redacted portions of the Report of Investigation ("ROI") and any subsequent ROIs that the case agent or any other agent has written. **Specifically, Ms. Dagnino requests (1) the agents'**

**handwritten notes when interviewing all of the material witnesses, including the two deported to Mexico; (2) any and all reports, including form I-213's, pertaining to all eight of the apprehended aliens, including the two deported to Mexico; (3) dispatch tapes detailing communication by the agents with the dispatcher while they were following both vehicles driven by Ms. Dagnino and Ms. Beltran; and (4) any and all reports prepared by the Brawley Police Department officers Brown and Linville.**

      3. **<u>Brady Material</u>**. Ms. Dagnino requests all documents, statements, agents' reports, and tangible evidence favorable to Ms. Dagnino on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976). Further, <u>Brady</u> requires the government disclose any information that may result in a lower sentence under the sentencing guidelines, notwithstanding its advisory nature, because it is exculpatory and/or mitigating evidence.

      4. **<u>Ms. Dagnino's Prior Record</u>.** Ms. Dagnino requests disclosure of her prior criminal record. Fed. R. Crim. P. 16(a)(1)(B). Specifically, she requests a certified copy of the charging documents, plea and sentencing transcripts, and judgment and conviction of any prior conviction used to increase or adjust her sentence under the advisory guidelines.

      5. **<u>Any Proposed 404(b) Evidence.</u>** Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Ms. Dagnino requests the government "articulate <u>precisely</u> the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions). Ms. Dagnino requests **three weeks notice before trial** to give the defense time to adequately investigate and prepare for trial.

      6. **<u>Evidence Seized.</u>** Ms. Dagnino requests production of evidence seized as a result of any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(c).

7. **Request for Preservation of Evidence.** Ms. Dagnino specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case be preserved. This request includes, but is not limited to, the vehicle involved in the case, the defendant's personal effects, and any evidence seized from the defendant or any third party. This request also includes any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g., undocumented aliens and transients). It is requested that the prosecutor be ordered to question all the agencies and individuals involved in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to inform those parties to preserve any such evidence. **Ms. Dagnino specifically requests the government preserve any and all dispatch tapes containing conversations between the agents and Brawley police officers while they were conducting surveillance on Ms. Dagnino and Ms. Beltran.**

8. **Tangible Objects.** Ms. Dagnino requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the Government's case-in-chief, or were obtained from or belong to Ms. Dagnino. Fed. R. Crim. P. 16(a)(1)(c).

9. **Expert Witnesses.** Ms. Dagnino requests the name, qualifications, and a written summary of the testimony of any person that the Government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided a minimum of **three weeks prior to trial** so the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

10. **Scientific and Other Information.** Ms. Dagnino requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Fed. R. Crim. P. 16(a)(1)(D).

11. ***Henthorn* Material.** Ms. Dagnino requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally conduct examination of records; appropriate Government agency may review files and notify AUSA of contents as long as AUSA makes the determination regarding material to be disclosed); United States v. Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

12. **Evidence of Bias or Motive to Lie.** Ms. Dagnino requests any evidence that any prospective Government witness is biased or prejudiced against Ms. Dagnino, or has a motive to falsify or distort his or her testimony.

13. **Impeachment Evidence.** Ms. Dagnino requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Ms. Dagnino. See Fed. R. Evid. 608, 609 and 613; Brady v. Maryland, 373 U.S. 83 (1963). **Specifically, Ms. Dagnino requests disclosure of the A- file of all eight material witnesses, including the two witnesses who were deported and any information relating to their criminal and immigration history**. **All of this is relevant impeachment information.**

14. **Evidence of Criminal Investigation of Any Government Witness.** Ms. Dagnino requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.** Ms. Dagnino requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an alcoholic.

16. **Witness Addresses.** Ms. Dagnino requests the name and last known address of each prospective Government witness. Ms. Dagnino also requests the name and last known address of every

witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **<u>Name of Witnesses Favorable to Ms. Dagnino.</u>** Ms. Dagnino requests the name of any witness who made an arguably favorable statement concerning Ms. Dagnino or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **<u>Statements Relevant to the Defense.</u>** Ms. Dagnino requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. *Giglio* **Information & Agreements Between the Government and Witnesses.** Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Ms. Dagnino requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment. Ms. Dagnino also requests discovery regarding any other express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States. **Specifically, Ms. Dagnino requests disclosure of any written or oral agreements made to all of the material witnesses, including the two material witnesses who were deported.**

20. **<u>Informants and Cooperating Witnesses.</u>** Ms. Dagnino requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Ms. Dagnino. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviaro v. United</u>

States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Ms. Dagnino. Brady v. Maryland, 373 U.S. 83 (1963). **Specifically, Ms. Dagnino requests disclosure of any written or oral agreements made to all of the material witnesses, including the two who were deported.**

21. **Bias by Informants or Cooperating Witnesses.** Ms. Dagnino requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

22. **Jencks Act Material.** Ms. Dagnino requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Ms. Dagnino to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (agent's interview notes reviewed with interviewee subject to Jencks Act).

23. **Residual Request.** Ms. Dagnino intends by this discovery motion to invoke her rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Ms. Dagnino requests that the Government provide her and her attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

**III.**

**MOTION TO PRESERVE AND VIEW THE EVIDENCE**

Ms. Dagnino requests an order for the government and its agents to preserve the evidence in her case and allow her, through her attorney and investigator to view the evidence including, but not limited to: (1) any cell phones seized from Ms. Dagnino; (2) the seized Nissan Sentra and Saturn Ion; (3) any dispatch tapes containing the conversations and observations of the agents while conducting surveillance on Ms. Dagnino or Ms. Beltran; (4) the A-files of all eight material witnesses, including the two that were

//

1 deported; (5) the video recordings of the interrogations of all the material witnesses, including the two that were deported.

## IV.

### THIS COURT SHOULD SEVER MS. DAGNINO'S TRIAL FROM THAT OF MS. BELTRAN

Although Rule 8(b) of the Federal Rules of Criminal Procedure permit defendants to be joined together in one indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions," under Rule 14(a), the Court may sever the defendants' joint trial if consolidation "appears to prejudice a defendant." A severance is appropriate "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Zafiro v. United States, 506 U.S. 534, 539 (1993). The Supreme Court has explained "a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id.

Here, joinder prejudices Ms. Dagnino because it "compromises[s] a specific trial right," namely the right to call her co-defendant, Ms. Beltran, as an exculpatory witness on her behalf. Zafiro, 506 U.S. at 539. To secure severance on this ground, a defendant must show (1) she would have called the codefendant at a severed trial; (2) the codefendant would in fact testify; and (3) the testimony would have been substantially exculpatory. United States v. Pitner, 307 F.3d 1178, 1181 (9th Cir. 2002) (citing United States v. Reese, 2 F.3d 870, 892 (9th Cir. 1993)).

Here, all three of these prongs are met. If Ms. Dagnino's case was severed from that of Ms. Beltran, she would call Ms. Beltran as a witness on her behalf. Second, based on discussion with counsel for Ms. Beltran, Brian Funk, if called to testify, Ms. Beltran would in fact testify on behalf of Ms. Dagnino. Third, the testimony would be substantially exculpatory. The testimony of Ms. Beltran would show that she never informed Ms. Dagnino what was going on during the smuggling venture and that Ms. Dagnino was unaware that the individuals she was driving in her car were illegal aliens. While not dispositive, the jury should at a minimum be permitted to hear this testimony so the jury is not prevented "from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.

"The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683,

690 (1986)); see also California v. Trombetta, 467 U.S. 479, 485 (1984). The "right to present a defense is clearly *fundamental*." United States v. Waters, 627 F.3d 345, 354 (9th Cir. 2010) (emphasis added). "This right includes, 'at a minimum, ... the right to put before a jury evidence that might influence the determination of guilt.'" United States v. Stever, 603 F.3d 747, 755 (9th Cir. 2010) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987); accord Washington v. Texas, 388 U.S. 14, 19 (1967). Absent a severance, however, Ms. Dagnino has no way to present Ms. Beltran as a witness to testify on her behalf and thus present evidence to the jury that might influence the determination of guilt or innocence.

Even more important, perhaps, every criminal defendant has the right to "remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty. . . for such silence." Malloy v. Hogan, 378 U.S. 1, 8 (1964). Without severance, there is no way Ms. Dagnino can preserve her constitutional right to present a defense without also giving up her constitutional right to remain silent and not testify. Thus severance is necessary.

## V.

## ALL EVIDENCE SEIZED AS A RESULT OF THE ILLEGAL TRAFFIC STOP MUST BE SUPPRESSED UNDER THE FOURTH AMENDMENT

**A.      The Fourth Amendment Requires a Traffic Stop Be Supported By A Reasonable Suspicion of Criminal Activity.**

The Fourth Amendment protects the "right of people to be secure in their persons, houses papers, and effects, against unreasonable searches and seizures." U.S. Constitution Amend. IV. The Fourth Amendment specifically prohibits unreasonable searches and seizures of a vehicle during brief investigatory stops. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). An officer may detain a motorist only upon a demonstration of "reasonable suspicion" of criminal activity. See United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Rodriguez, 976 F.2d 592, 594 (9th Cir. 1992), amended 997 F.2d 1306 (9th Cir. 1993) (stating that an officer may not detain a motorist without a showing of a "particularized and objective basis for suspecting the particular person stopped of criminal activity" (quoting Cortez, 449 U.S. at 417-18)).

The government bears the burden of establishing that the totality of the circumstances attendant to the immigration stop gave the agents reasonable suspicion that criminal activity was afoot. United States

v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir. 2002). In determining whether there was reasonable suspicion the Court "must look at the 'totality of the circumstances' of the case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'" Id. (quoting United States v. Arvizu, 534 U.S. 266 (2002)). "[R]easonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'" Sigmond-Ballesteros, 285 F.3d at 1121. (quoting United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994), overruled in part on other grounds by United States v. Montero-Camargo, 208 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc), cert. denied sub nom. Sanchez-Guillen v. United States, 531 U.S. 889 (2000).

A determination of whether an officer had "reasonable suspicion" of wrongdoing is "'not readily, or even usefully, reduced to a neat set of legal rules.'" Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)); see also United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir. 1989). Rather, in making reasonable-suspicion determinations, the Court must consider the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting criminal activity. United States v. Cotrez, 449 U.S. 411, 418 (1981); see also United States v. Arvizu, 534 US. 266 (2002) (holding that the "totality of the circumstances" inquiry of an investigatory stop of a vehicle must be based on all factors, collectively, and not each in isolation). While this inquiry "includes the 'collective knowledge of the officers involved, and inferences reached by experienced, trained officers,'" Hall, 974 F.2d at 1204 (other internal quotations omitted), this experience may *not* be used to give the officers unbridled discretion in making a stop. See Hernandez-Alvarado, 891 F.2d at 1416; see also Florida v. J.L., 529 U.S. 266, 271 (2000) (finding a tip from an anonymous informant did not give rise to sufficient reasonable suspicion to perform a Terry stop).

The Ninth Circuit has explained the factual considerations in determining whether the totality of circumstances justify a brief investigatory stop by Border Patrol agents. These include "(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience." United States v. Berber-Tinoco, 510 F.3d 1083, 1087 (9th Cir. 2007) (quotations and citations omitted).

1  **B.    There Was No Reasonable Suspicion Of Criminal Activity And Therefore The Traffic Stop Violated The Fourth Amendment.**

Looking at the facts relied upon by the Border Patrol agents in stopping Ms. Dagnino's car and comparing them to the Berber-Tinoco factors, it is clear the agents lacked a reasonable suspicion of criminal activity necessary to stop the car.

The agents' justification for pulling Ms. Dagnino over was that she failed to signal while turning left from River Drive onto Highway 111. But this is simply not true since River Drive and Highway 111 do not intersect. Similarly, the agents observation that the car was "riding low" and "very crowded" should be viewed with skepticism as neither the Sentra nor the Ion had more passengers in it than the cars could otherwise accommodate. This was not a situation where ten people were stuffed into a car designed to accommodate five. Rather there were five people in a car designed to drive five people. It was thus unlikely to be "riding low" or "very crowded" to the point of arousing suspicion of alien smuggling. Even the agents acknowledge this when they refused to pull over Ms. Dagnino because the car was riding low, but rather because she failed to signal while making a phantom left turn at a non-existent intersection.

Nor is there anything suspicious about the area that could arouse the agents' suspicions. Brawley is 23 miles away from the international border. This is not an area "notorious" for alien smuggling. River Drive, meanwhile, is a residential neighborhood, with an elementary school and a park just two blocks away. See Exhibit B. Nor is there anything suspicious about a car driving at 5:30 a.m., a time of day when people may be beginning their morning commute to work. The agents observed nothing suspicious about the way Ms. Dagnino was driving; she did not change lanes, speed or drive erratically.

As Sigmond-Ballesteros explains "although law enforcement officials are entitled to assess the facts in light of their experience, experience may not be used to give the officers unbridled discretion in making a stop." Sigmond-Ballesteros, 285 F.3d at 1126-1127 (quoting Montero-Camargo, 208 F.3d at 1131) (quotations omitted). Moreover, "reasonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'" Sigmond-Ballesteros, 285 F.3d at 1121. Here, the sight of Ms. Dagnino driving on the road with a car full of passengers is a common occurrence by many drivers. This was not enough under the 4th

//

Amendment to permit the officers to stop and detain Ms. Dagnino, particularly when the intersection Ms. Dagnino allegedly failed to use her turn signal does not exist.

Therefore the stop was illegal and any evidence obtained as a result of that stop must be suppressed. See Wong Sun v. United States, 371 U.S. 471 (1963).

## VI.

## **THIS COURT SHOULD CONDUCT AN EVIDENTIARY HEARING TO DETERMINE WHETHER MS. DAGNINO'S CONSTITUTIONAL RIGHTS WERE VIOLATED**

Because Ms. Dagnino's motion to suppress necessitates this Court to make a factual determination, an evidentiary hearing is necessary to resolve the issues. Where a factual determination is required, Rule 12 of the Federal Rules of Criminal Procedure obligates courts to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading. Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)). Therefore this Court should hold an evidentiary hearing.

## VII.

## **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

***Defense counsel has received 65 pages of discovery but no DVDs in this case.*** As more information comes to light, due to the Government providing additional discovery in response to these motions or an order of this Court, the defense may find it necessary to file further motions. It is, therefore, requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

## VIII.

## **CONCLUSION**

For the foregoing reasons, Ms. Dagnino respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: February 7, 2011
*s/ Hanni M. Fakhoury*
**HANNI M. FAKHOURY**
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Dagnino